

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-09-400-CV

KEVIN CLARK                                                       APPELLANT

V.

COTTEN SCHMIDT, L.L.P. F/K/A                                      APPELLEE
KIRKLEY SCHMIDT & COTTEN, L.L.P.

------------

FROM THE 48TH DISTRICT COURT OF TARRANT COUNTY

------------

## OPINION

------------

In two issues, appellant Kevin Clark appeals the trial court's decision to deny his motion for summary judgment and grant the motion for summary judgment of appellee Cotten Schmidt, L.L.P. f/k/a Kirkley Schmidt & Cotten, L.L.P. (Cotten Schmidt). We affirm in part and reverse and remand in part.

### Background Facts

This appeal concerns the amount of money that Clark was entitled to receive as a repayment of his capital investment under Cotten Schmidt's

partnership agreement upon his leaving the law firm. Clark joined the firm in the fall of 2001 as a non-equity partner. In 2003, Clark became an equity partner, and he contributed $25,000 to the firm as capital.

The partnership agreement contains the following relevant provisions:

1.04. Classes of Partners. There shall be four (4) classes of partners.

a. "Equity Partners" are those partners who (i) have contributed to the capital of the partnership, (ii) own an interest in the capital and in the profits and losses of the partnership, (iii) have a vote in partnership matters, and (iv) participate in the distribution of partnership profits as defined in Article VIII.

. . . .

3.02. Assets. The assets of the partnership are:

a. Cash balances in partnership accounts other than any trust accounts maintained by the partnership;

b. The physical assets and personal property as reflected on the partnership's books, records, and financial statements;

c. The notes and accounts receivable of the partnership; and

d. Work in process and contingent-fee interests.

. . . .

5.01. Books. The partnership shall maintain books and records to reflect all business and financial transactions using the cash basis of accounting unless otherwise agreed.

. . . .

2

6.01. <u>Equity Partners</u>. All Equity Partners . . . shall have an equal ownership interest in the assets of the partnership . . . .

. . . .

6.04. <u>Capital Contributions By New Equity Partners</u>. All Equity Partners to be admitted to the partnership shall be required to make a capital contribution to the partnership as determined by the partnership. The amount of capital contribution credited to the capital account of the new Equity Partner shall be designated by the partnership with the prior concurrence of the new Equity Partner.

. . . .

6.07. <u>Capital Accounts on Termination</u>. . . . [A]n Equity Partner's interest in the partnership on termination of the partnership shall not be determined by his or her capital account. All Equity Partners shall have an equal interest in the value of partnership assets . . . .

. . . .

12.03. <u>Withdrawal of Equity (including Senior) Partner</u>. An Equity Partner who withdraws from the partnership, and who is not then in substantial breach of his or her duties to the partnership, shall be entitled to the following:

    a. To payment . . . of his or her percentage of fees collected for noncontingent work performed by the partnership prior to the effective date of withdrawal and collected by the partnership within twenty-four (24) months after the effective date of withdrawal;

    b. To payment . . . of his or her percentage of fees collected for work performed by the partnership prior to the effective date of withdrawal on contingent-fee or bonus-fee cases, regardless of how long after the

date of withdrawal those fees are collected by the partnership. . . .;[1] and

    *c.    To repayment of his or her capital investment in the partnership calculated as an equal interest in the depreciated book value of all partnership assets less an equal proportion of the partnership long term and capital debt. If negative, this liability will offset amounts under subsections (a) or (b).*[2]  [Emphasis added.]

Clark voluntarily left the firm in May 2005, at which time it had eleven equity partners. After consulting with accountants, the firm paid $4,640.36 to Clark as his capital investment repayment under section 12.03(c) of the partnership agreement; the firm said that this amount reflected "one-eleventh of the Total Partners' Equity reflected on the May 31, 2005 balance sheet." Clark contended that the firm incorrectly valued his capital investment repayment. He relied on an opinion from an accountant who reviewed the partnership agreement and concluded that the firm wrongly excluded the

---

[1]Clark does not claim that he has not received proper payments under sections 12.03(a) and (b) of the agreement. Randall Schmidt, a partner at Cotten Schmidt, stated in an affidavit,

    As the firm collected fees after the date of Mr. Clark's withdrawal on accounts receivable and work-in-process for work performed by the firm before the date of his withdrawal, the firm's administrator applied the applicable compensation formula to those fee collections . . . and issued checks to Mr. Clark . . . .

[2]The partnership agreement also references a Partner Compensation Addendum. The addendum specifies how hourly, contingent, and bonus fees are distributed to individuals within the firm; it states, among other provisions, that "a portion of all fees earned be shared among the partners in recognition of the partnership effort required to maintain the firm."

4

following items from the definition of "partnership assets" under section 12.03(c): notes, accounts receivable, work in process, and contingent fee interests.

Clark filed a lawsuit against Cotten Schmidt, asserting that it breached section 12.03(c) of the partnership agreement by incorrectly calculating and paying him the $4,640.36 and also breached a fiduciary duty to him. Cotten Schmidt answered Clark's allegations and filed a motion for summary judgment in which it argued that quasi-estoppel precludes Clark's breach of contract claim and that, as a matter of law, the firm did not owe a fiduciary duty to him.[3]

Clark filed a motion for summary judgment on his breach of contract claim; he asserted that notes, accounts receivable, work in process, and contingent fee interests are unambiguously included under section 12.03(c)'s capital-investment-repayment calculation, which uses the phrase "all partnership assets," because those items are included in section 3.02's definition of "assets." Cotten Schmidt contended, "When the language of section 12.03(c), and Mr. Clark's current interpretation, are considered in context . . ., it becomes apparent that the firm's interpretation . . . is correct, and that Mr. Clark's current interpretation is wrong."

---

[3]Clark described his contractual claims in his petition as "Breach of Contract," "Neglecting to perform contractual duty," and "Refusing to perform contractual obligations." Our reference to Clark's breach of contract cause of action includes each of these claims. We will detail the facts relevant to Cotten Schmidt's quasi-estoppel defense in our discussion of Clark's second issue.

The trial court denied Clark's summary judgment motion and granted Cotten Schmidt's motion against Clark's contractual claim based on its quasi-estoppel defense, concluding that Cotten Schmidt established all elements of the defense as a matter of law.[4] Clark filed notice of this appeal.

**Summary Judgment Standards**

In a summary judgment case, the issue on appeal is whether the movant met the summary judgment burden by establishing that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We review a summary judgment de novo. *Mann Frankfort*, 289 S.W.3d at 848. We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Id.* We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008).

A plaintiff is entitled to summary judgment on a cause of action if it conclusively proves all essential elements of the claim. *See* Tex. R. Civ. P.

---

[4]The court also concluded that the firm did not have a fiduciary duty to Clark. Clark does not challenge the trial court's decision to grant summary judgment against his breach of fiduciary duty claim; therefore, we affirm the trial court's judgment to the extent that it resolves that claim against Clark. *See Jacobs v. Satterwhite*, 65 S.W.3d 653, 655–56 (Tex. 2001); *Smith v. Tilton*, 3 S.W.3d 77, 84 (Tex. App.—Dallas 1999, no pet.).

6

166a(a), (c); *MMP, Ltd. v. Jones*, 710 S.W.2d 59, 60 (Tex. 1986).  A defendant is entitled to summary judgment on an affirmative defense if the defendant conclusively proves all the elements of the affirmative defense.  *Chau v. Riddle*, 254 S.W.3d 453, 455 (Tex. 2008); *see* Tex. R. Civ. P. 166a(b), (c).  When both parties move for summary judgment and the trial court grants one motion and denies the other, the reviewing court should review both parties' summary judgment evidence and determine all questions presented.  *Mann Frankfort*, 289 S.W.3d at 848.

### Quasi-Estoppel

In his second issue, Clark argues that the trial court erred by granting Cotten Schmidt's motion for summary judgment.  Cotten Schmidt's sole argument in its motion was that Clark's breach of contract claim is barred by quasi-estoppel; Cotten Schmidt did not seek summary judgment on the correctness of its interpretation of the partnership agreement.

**The law on quasi-estoppel**

Quasi-estoppel is an affirmative defense that "precludes a party from asserting, to another's disadvantage, a right inconsistent with a position previously taken.  The doctrine applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit." *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex. 2000) (citation omitted); *see Brooks v. Brooks*, 257 S.W.3d 418, 423 (Tex. App.—Fort Worth 2008, pet. denied) (explaining that

7

"unlike equitable estoppel, quasi-estoppel requires no showing of misrepresentation or detrimental reliance"). "Thus, quasi estoppel forbids a party from accepting the benefits of a transaction . . . and then subsequently taking an inconsistent position to avoid corresponding obligations or effects." *Atkinson Gas Co. v. Albrecht*, 878 S.W.2d 236, 240 (Tex. App.—Corpus Christi 1994, writ denied).

For example, in *Cimarron County Property Owners Association v. Keen*, the Beaumont Court of Appeals held that quasi-estoppel precluded the owners association from contending in a lawsuit that a deed restriction prohibited a daycare when the association previously opined that the daycare could operate. 117 S.W.3d 509, 512–14 (Tex. App.—Beaumont 2003, no pet.). Similarly, in *Eckland Consultants, Inc. v. Ryder, Stilwell Inc.*, the Houston (First District) Court of Appeals held that quasi-estoppel prevented a property inspection company from claiming that a plaintiff did not have standing to sue for a breach of the inspection contract when the inspection company accepted the benefits of the contract and stated in a report that noncontracting entities could rely on the report. 176 S.W.3d 80, 81–83, 87–88 (Tex. App.—Houston [1st Dist.] 2004, no pet.). However, there "can be no ratification or estoppel from acceptance of the benefits by a person who did not have knowledge of all material facts." *Frazier v. Wynn*, 472 S.W.2d 750, 753 (Tex. 1971); *Sun Operating Ltd. P'ship v. Holt*, 984 S.W.2d 277, 292 (Tex. App.—Amarillo 1998, pet. denied) (op. on reh'g).

**Analysis**

In 2003, when Clark was an equity partner with Cotten Schmidt, J. Lyndell Kirkley left the firm. Like Clark's later dispute, Kirkley contested the amount of his capital investment repayment under section 12.03(c) of the partnership agreement, claiming that work in process, accounts receivable, and contingent fee interests were payable assets of the partnership under that section.[5] According to Cotten Schmidt, Clark and Dennis M. Conrad served on a committee formed to communicate with Kirkley about his claim. Conrad stated in an affidavit, "Mr. Clark agreed with the firm's position that the method of calculation of Mr. Kirkley's payment was correct under the firm's partnership agreement, and Mr. Clark signed letters on behalf of the firm to Mr. Kirkley communicating the firm's position."

Specifically, on September 19, 2003, Clark signed a letter to Kirkley stating, "We believe that the . . . check tendered to you is the correct amount owed to you under the . . . partnership agreement." On November 4, 2003, Clark signed another letter to Kirkley that detailed the firm's reasons that it disagreed with Kirkley's position. The November 4, 2003 letter described Kirkley's claim as "simply wrong." In its last paragraph, the letter stated,

---

[5]In a letter that Kirkley wrote to Randall Schmidt in September 2003, Kirkley said, "I am amazed that your attempted repayment to me under paragraph 12.03(c) disregards the plain language of the Agreement adopted by all partners."

9

> We have differing views of what the Partnership Agreement provides a withdrawing partner is entitled to . . . . In any event, we are willing to sit down with you in a spirit of compromise and engage in a professional discussion of the outstanding differences between us in an attempt to resolve them amicably. . . . Please call me if you are interested in having such a discussion.

Days later, Clark signed another letter that was addressed to Kirkley and that expressed disagreement with Kirkley's position.[6] After the firm sent Clark's last letter to Kirkley, Kirkley did not pursue any claim against the firm related to the repayment of his capital investment.

In his response to Cotten Schmidt's summary judgment motion, Clark said that during the Kirkley dispute, he was "simply acting as a point person" and was not a real participant. His affidavit contained the following facts supporting that position:

- three other attorneys in the firm "took the lead in attempting to resolve the dispute" with Kirkley, but those attorneys eventually stopped communicating with Kirkley, and Clark agreed to relay Cotten Schmidt's position to him;

- the letters that Clark signed were prepared by other partners in the firm;[7]

- Clark "did not participate in formulating Cotten Schmidt's position against Mr. Kirkley," nor did he "conduct any inquiry as to whether the position was correct" or even "provide any input as to Cotten Schmidt's position or the correctness thereof"; instead, his role "was simply to communicate Cotten Schmidt's position to Mr. Kirkley and receive his responses"; and

---

[6]In its motion for summary judgment, Cotten Schmidt said that appellant's letters to Kirkley were sent "on behalf of the firm."

[7]Cotten Schmidt does not dispute that a committee drafted the letters and that Clark signed them.

- in his communication with Kirkley, Clark was not "representing [his] own interest[,] and [he] took no position as to [his] view individually as to the interpretation of the Partnership Agreement."

Clark contends that his affidavit creates fact issues that preclude summary judgment for Cotten Schmidt. We agree. While Cotten Schmidt provided evidence (through Conrad's affidavit) that Clark served on a committee during the Kirkley dispute and "agreed with the firm's position that the method of calculation of Mr. Kirkley's payment was correct," Clark countered that evidence by averring that he did not participate in forming the firm's position and took no position as to the interpretation of the agreement. Clark's affidavit, viewed in the light most favorable to him (as the nonmovant), indicates that he served as a conduit of Cotten Schmidt's position to Kirkley rather than as a creator or endorser of that position and that he therefore did not have knowledge of all material facts about the position. *See Frazier*, 472 S.W.2d at 753.

Cotten Schmidt alleges that Clark's assertion that he acted as a conduit for the other equity partners is false because Clark had the privilege and legal responsibility to vote on the Kirkley matter. But the evidence does not conclusively establish that Clark actually voted on the matter or was asked for his opinion about it. While Conrad's affidavit indicates that the dispute was handled by a committee with input and approval from "other" (although not explicitly "all") partners, Clark's affidavit states only that three partners "took the lead" in attempting to resolve the dispute with Kirkley and explains that he was never "asked to provide input" on the matter.

11

For these reasons, resolving all doubts in Clark's favor on the quasi-estoppel issue, we hold that Cotten Schmidt did not conclusively establish that it is unconscionable to allow him to maintain a position inconsistent with one to which he previously acquiesced on behalf of Cotten Schmidt even if Clark, as an equity partner, received a benefit in 2003 by Cotten Schmidt's retaining money that it might have otherwise paid to Kirkley. *See Lopez*, 22 S.W.3d at 864. Therefore, we sustain Clark's second issue, and we reverse the portion of the trial court's order that grants summary judgment for Cotten Schmidt against Clark's breach of contract claim based on Cotten Schmidt's quasi-estoppel defense. *See Haire v. Nathan Watson Co.*, 221 S.W.3d 293, 301 (Tex. App.—Fort Worth 2007, no pet.) (explaining that when "reviewing a summary judgment granted on specific grounds, the summary judgment can only be affirmed if the ground on which the trial court granted relief is meritorious); *GuideOne Ins. Co. v. Cupps*, 207 S.W.3d 900, 903 (Tex. App.—Fort Worth 2006, pet. denied) (same).

### Interpretation of the Partnership Agreement

In his first issue, Clark contends that the trial court erred by denying his motion for summary judgment on his breach of contract claim because, as a matter of law, Cotten Schmidt misinterpreted section 12.03(c) of the partnership agreement and therefore undervalued his capital investment repayment. Cotten Schmidt asserts that its interpretation of section 12.03(c) is correct "when all of the words . . . are properly construed in conjunction with the remainder of . . . the Partnership Agreement."

12

**The principles of interpreting contracts**

"The law applicable to construction of contracts has been applied to partnership agreements." *In re Waggoner Estate*, 163 S.W.3d 161, 165 (Tex. App.—Amarillo 2005, no pet.). "We construe contracts 'from a utilitarian standpoint bearing in mind the particular business activity sought to be served' and 'will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive.'" *Frost Nat'l Bank v. L & F Dist., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (quoting *Reilly v. Rangers Mgmt., Inc.*, 727 S.W.2d 527, 530 (Tex. 1987)).

When construing contracts, our primary concern is to ascertain the true intent of the parties as expressed in the contract. *NP Anderson Cotton Exch., L.P. v. Potter*, 230 S.W.3d 457, 463 (Tex. App.—Fort Worth 2007, no pet.). We must examine and consider the entire contract in an effort to harmonize and give effect to all provisions so that none are rendered meaningless. *Id.*; *see J.M. Davidson, Inc. v. Webste*r, 128 S.W.3d 223, 229 (Tex. 2003). "We presume that the parties to the contract intend every clause to have some effect. We give terms their plain, ordinary, and generally accepted meaning unless the contract shows that the parties used them in a technical or different sense." *FWT, Inc. v. Haskin Wallace Mason Prop. Mgmt., L.L.P.*, 301 S.W.3d 787, 794 (Tex. App.— Fort Worth 2009, pet. denied) (op. on reh'g) (citations omitted). A specific contractual provision controls over a general provision. *City of The Colony v. N.*

13

*Tex. Mun. Water Dist.*, 272 S.W.3d 699, 722 (Tex. App.—Fort Worth 2008, pet. dism'd).

Lack of clarity or a disagreement among the parties does not necessarily create an ambiguity. *Universal Health Servs., Inc. v. Renaissance Women's Group, P.A.*, 121 S.W.3d 742, 746 (Tex. 2003). Rather, whether "a contract is ambiguous is a question of law that must be decided by examining the contract as a whole in light of the circumstances present when the contract was entered." *Id.* "If, after the pertinent rules of construction are applied, the contract can be given a definite or certain legal meaning, it is unambiguous and we construe it as a matter of law." *Frost Nat'l Bank*, 165 S.W.3d at 312. But if a contract is ambiguous, then interpretation of the contract presents a fact issue for the jury. *Transcon. Gas Pipeline Corp. v. Texaco, Inc.*, 35 S.W.3d 658, 665 (Tex. App.—Houston [1st Dist.] 2000, pet. denied). "When the [contract] is not ambiguous on its face, extrinsic evidence may not be used to create an ambiguity." *Balandran v. Safeco Ins. Co. of Am.*, 972 S.W.2d 738, 745 (Tex. 1998); *see CenterPoint Energy Houston Elec., L.L.P. v. Old TJC Co.*, 177 S.W.3d 425, 431 (Tex. App.—Houston [1st Dist.] 2005, pet. denied).

**Analysis**

The parties dispute the meaning of section 12.03(c) of the partnership agreement, which states that a withdrawing equity partner is entitled to "repayment of his or her capital investment in the partnership calculated as an equal interest in the depreciated book value of all partnership assets less an

14

equal proportion of the partnership long term and capital debt." Specifically, Clark contends that "all partnership assets" in section 12.03(c) unambiguously includes notes, accounts receivable, work in process, and contingent fee interests because those items are included in section 3.02's definition of assets. Cotten Schmidt argues that section 12.03(c)'s "all partnership assets" phrase does not include those items for the following reasons:

- section 12.03(c) should not be interpreted to allow a withdrawing partner to obtain a share of accounts receivable and work in process for work performed by the partnership because sections 12.03(a) and (b) already give the partner a percentage of those items that are collected after the partner leaves (thus, 12.03(c), if interpreted in the way that Clark asserts, would allow for double recovery);

- section 5.01 of the partnership agreement says that the partnership uses the cash basis of accounting, which does not recognize accounts receivable, work in process, and contingent fee interests;[8]

- because section 12.03(c) uses the words "capital" and "depreciated book value", it refers only to capital assets that are "funded with capital investment or long term/capitalized debt"; it does not therefore refer to accounts receivable, work in process, and contingent fee interests, and the specific limiting language in section 12.03(c) controls over the general language in section 3.02;

- if "the capital investment repayment calculation were to include accounts receivable, but Cotten Schmidt never collected certain accounts, then the interest of the withdrawn Equity Partner would be elevated over the

---

[8]Cotten Schmidt submitted the affidavit of David J. Quick, a certified public accountant, which affirmed that the cash basis of accounting "does not recognize accounts receivable, work-in-process, and contingent fee interests" and opined that the cash basis of accounting is a "foundational reference point that should be used for all other . . . terms in the partnership agreement." Clark's accountant believed that the "cash basis of accounting has nothing to do with valuing a partnership interest" because the "valuation method [was] described in the partnership agreement."

15

interests of the firm and the remaining Equity Partners, in violation of the . . . principles underlying the Partnership Agreement"; and

- under Clark's argument, shortly after making his $25,000 capital contribution in 2003, he would have been able to resign and be paid a substantially greater sum; thus, Clark's construction of the agreement creates an incentive for equity partners to leave the firm.

For the following reasons, Cotten Schmidt has shown that section 12.03(c) could reasonably be interpreted to exclude notes, accounts receivable, work in process, and contingent fee interests; thus, Clark's interpretation of the agreement is not conclusively correct. First, the phrase "depreciated book value" precedes "all partnership assets" in section 12.03(c), and the items described in section 3.02(c) and (d) of the agreement are not depreciable.[9] Second, the phrase "equal interest in the depreciated book value of all partnership assets" in section 12.03(c) is followed by "less an equal proportion of the partnership long term and capital debt," which may indicate that all of section 12.03(c) refers to capital assets and excludes noncapital assets.[10] Third, sections 12.03(a) and (b) limit a withdrawing equity partner to receiving a portion of noncontingent and contingent fees when the firm actually collects those fees after the partner withdraws, while Clark's interpretation of section 12.03(c) may entitle him to a portion of those fees regardless of whether they are ever collected or earned and

---

[9]Clark has not disputed Cotten Schmidt's claim that notes, contingent fee interests, accounts receivable, and work in process are not depreciable.

[10]Words in a contract may "not be plucked from their context and then construed." *King's Court Racquetball v. Dawkins*, 62 S.W.3d 229, 233 (Tex. App.—Amarillo 2001, no pet.).

16

may therefore render meaningless the limitations of sections 12.03(a) and (b). *See Potter*, 230 S.W.3d at 463. Finally, Clark's interpretation of section 12.03(c) might allow him to be paid for his share of an account receivable upon withdrawal under section 12.03(c) and then be paid again when a fee from the account is collected under sections 12.03(a) or (b); this double recovery could be considered unreasonable or inequitable. *See Frost Nat'l Bank*, 165 S.W.3d at 312.

Therefore, resolving all doubts in Cotten Schmidt's (the nonmovant's) favor, we hold that Clark's interpretation of section 12.03(c) is not conclusively correct and that the trial court did not err by denying his motion for summary judgment. *See Parker*, 249 S.W.3d at 399; *MMP, Ltd.*, 710 S.W.2d at 60. We overrule Clark's first issue.[11]

---

[11]Because we hold that Cotten Schmidt's interpretation of the agreement is reasonable, which precludes summary judgment in Clark's favor, causes us to overrule his first issue, and requires us to remand this case to the trial court, we will not address whether Clark's interpretation of the agreement is also reasonable. In other words, we will not address whether Cotten Schmidt's interpretation of the agreement is conclusively correct, or alternatively, whether the agreement is ambiguous, because Cotten Schmidt did not move for summary judgment based on its interpretation. *See Gibson v. Park Cities Ford, Ltd.*, 174 S.W.3d 930, 931 (Tex. App.—Dallas 2005, no pet.) ("Because we conclude Park Cities Ford did not conclusively establish its entitlement to summary judgment, we reverse the trial court's judgment and remand this case to the trial court for further proceedings."); *see also S. Austin Mkt. Place, Inc. v. James F. Parker Interests, Inc.*, No. 03-99-00144-CV, 2000 WL 374064, at *4 (Tex. App.—Austin Apr. 13, 2000, no pet.) (not designated for publication) ("Without deciding whether an ambiguity exists in the contract, we hold that South Austin has not conclusively proven that its interpretation of the agreement is the only reasonable interpretation").

## Conclusion

Having overruled Clark's first issue and having sustained his second issue, we affirm the trial court's judgment to the extent that it (1) grants Cotten Schmidt's motion for summary judgment on Clark's breach of fiduciary duty claim (because he did not make a challenge regarding that claim in this court) and (2) denies Clark's motion for summary judgment.  But we reverse the judgment to the extent that it renders a take nothing judgment on Clark's breach of contract claim, and we remand this case to the trial court for further proceedings related to that claim.

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; MCCOY, J.; and DIXON W. HOLMAN (Senior Justice, Retired, Sitting by Assignment).

DELIVERED:  October 7, 2010

18